**Sanjay S. Schmidt (SBN 247475)**
**LAW OFFICE OF SANJAY S. SCHMIDT**
1388 Sutter Street, Suite 810
San Francisco, CA 94109
T: (415) 563-8583
F: (415) 223-9717
e-mail: ss@sanjayschmidtlaw.com

**Grace Jun (SBN 287973)**
**GRACE JUN, ATTORNEY AT LAW**
501 West Broadway, Ste. 1480
San Diego, CA 92101
T: (310) 709-4012
e-mail: grace@gracejunlaw.com

**Panos Lagos (SBN 61821)**
**LAW OFFICES OF PANOS LAGOS**
6569 Glen Oaks Way
Oakland, CA 94611
T: (510) 530-4078 x 101
F: (510) 530-4725
e-mail: panos@panoslagoslaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

WILLIAM HENNE, Decedent, by and through his successors in interest; F.H., a minor, by and through her proposed guardian ad litem, Reatana Ven, individually and as co-successor in interest to Decedent; W.A.H., a minor, by and through his proposed guardian ad litem, Alexis Celeste, individually and as co-successor in interest to Decedent; W.R.H., a minor, by and through his proposed guardian ad litem, Alexis Celeste, individually and as co-successor in interest to Decedent,

Plaintiffs,

vs.

COUNTY OF SAN JOAQUIN, a public entity; and DOES 1-25,

Defendants.

) Case No.
)
) **COMPLAINT FOR DAMAGES AND**
) **DEMAND FOR JURY TRIAL**
)
) 42 U.S.C. § 1983 – *Monell* Cause of Action
) for Unconstitutional Customs, Policies, and
) Practices and Collective Inaction
)

Plaintiffs, by and through their attorneys, the LAW OFFICE OF SANJAY S. SCHMIDT GRACE JUN, ATTORNEY AT LAW, and LAW OFFICES OF PANOS LAGOS, for their

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                    1

Complaint against Defendants, state as follows:

**<u>INTRODUCTION</u>**

1.   This is a civil-rights action arising from the denial by subordinates of the County of San Joaquin of adequate treatment for the serious medical needs of pretrial detainee WILLIAM HENNE ("HENE"), thereby putting HENNE at substantial risk of suffering serious harm, despite the availability of measures to abate or reduce the risk of serious harm that the COUNTY could have, but failed to, have in place, ultimately culminating in his death. HENNE died on August 13, 2023, in the San Joaquin County Jail, at French Camp, in the County of San Joaquin, California ("the Jail"). The cause of death was listed as "sudden death while experiencing opioid withdrawal." Mr. HENNE requested medical assistance on August 11, 2023, when he began experiencing symptoms of fentanyl withdrawal. He told nurses at the Jail that he abused fentanyl daily. Despite the Jail's awareness that Mr. HENNE suffered a serious medical condition, HENNE did not receive adequate treatment for acute fentanyl withdrawal, leading to his death.

2.   Untreated acute fentanyl withdrawal can be lethal, particularly due to dehydration. There is also an increased risk of suicide. On April 9, 2019, the Food and Drug Administration (FDA) issued a warning regarding the risk of suicide among individuals who suddenly discontinue use of opioids. Individuals suffering from fentanyl withdrawal will also present differently with varying symptom severity. Moreover, symptom severity can quickly worsen. Effective treatment of withdrawal from fentanyl requires immediate administration of medication – either methadone or buprenorphine. For these reasons, a physician must closely monitor and oversee the care of the patient withdrawing from fentanyl to adjust medication levels and treatment.

3.   In this case, HENNE suffered from acute fentanyl withdrawal, which was not treated. No physician monitored or oversaw Mr. HENNE's care while he was suffering from withdrawal. There was no physician even on-site. On August 12 and August 13, when Mr. HENNE's symptoms were the most severe and his need for emergency intervention most obvious, there was not even a high-level provider (e.g., a Physician's Assistant or Nurse Practitioner) who could assess Mr. HENNE. The Jail was chronically understaffed, with positions for nurses and nurse practitioners

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    2

that were vacant and unfilled on August 12th and 13th.

4. The care of inmates suffering from drug withdrawal at the San Joaquin County Jail is improperly tasked to nurses who are not qualified to provide adequate care. Nurses act pursuant to "standard nursing procedures" (SNPs) or protocols that set forth the care to be provided. The SNP for treatment of opioid/fentanyl withdrawal, however, is constitutionally deficient because it does not mandate medication for treatment of opioid withdrawal – which is the only way acute opioid withdrawal can be managed to avoid serious injury or death.

5. Meanwhile, the County of San Joaquin was well-aware of deficiencies in the care provided to individuals at risk of suffering serious harm from drug withdrawal. In the 10 years preceding Mr. HENNE's death, 36 inmates died at the San Joaquin County Jail. Thus, the County had actual and constructive notice that its policies, practices, and customs were constitutionally deficient at the Jail and causing the death of inmates due to medical neglect.

## JURISDICTION

6. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because this case is brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988. This action is brought pursuant to the Fourteenth Amendment to the United States Constitution.

## INTRADISTRICT ASSIGNMENT TO SACRAMENTO DIVISION

7. A substantial part of the events and/or omissions complained of herein occurred in the San Joaquin County Jail, at French Camp, in the County of San Joaquin, California, and, pursuant to Eastern District Civil Local Rule 120(d), this action is properly assigned to the Sacramento Division of the United States District Court for the Eastern District of California.

## PARTIES AND PROCEDURE

8. Minor Plaintiff F.H. is and was at all times herein mentioned the daughter of Decedent WILLIAM HENNE and a resident of the State of California. She is being represented in this matter by her mother and proposed guardian ad litem, Reatana Ven, pursuant to Federal Rule of Civil

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                    3

Procedure 17(c). Minor Plaintiff F.H. brings these claims individually for wrongful death and violation of her personal rights, and as co-successor in interest for her father, Decedent WILLIAM HENNE, pursuant to California Code of Civil Procedure § 377.11 and federal civil-rights law, asserting survival claims for WILLIAM HENNE, under federal law.

9. Minor Plaintiff W.A.H. is and was at all times herein mentioned the son of Decedent WILLIAM HENNE, and a resident of the State of California. He will be represented in this matter by his mother and proposed guardian ad litem, Alexis Celeste, pursuant to Federal Rule of Civil Procedure 17(c). Plaintiff W.A.H. brings these claims individually for wrongful death and violation of his personal rights, and as a co-successor in interest for his father, Decedent WILLIAM HENNE, pursuant to California Code of Civil Procedure § 377.11 and federal civil rights law, asserting survival claims for WILLIAM HENNE, under federal law.

10. Minor Plaintiff W.R.H. is and was at all times herein mentioned the son of Decedent WILLIAM HENNE, and a resident of the State of California. He will be represented in this matter by his mother and proposed guardian ad litem, Alexis Celeste, pursuant to Federal Rule of Civil Procedure 17(c). Plaintiff W.R.H. brings these claims individually for wrongful death and violation of his personal rights, and as a co-successor in interest for his father, Decedent WILLIAM HENNE, pursuant to California Code of Civil Procedure § 377.11 and federal civil rights law, asserting survival claims for WILLIAM HENNE, under federal law.

11. Plaintiffs bring these claims pursuant to California Code of Civil Procedure §§ 377.20 *et seq.*, which provides for survival actions. Plaintiffs bring the *Monell*[1] claims in this action both individually and on behalf of WILLIAM HENNE, on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and federal civil-rights law. Plaintiffs also bring these claims as Private Attorneys General, to vindicate not only their rights, but others' civil rights of great importance.

12. Defendant COUNTY OF SAN JOAQUIN ("COUNTY") is a public entity, established by

---

[1] *Monell v. Dept. of Soc. Services.*, 436 U.S. 658 (1978).

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                          4

the laws and Constitution of the State of California, which owns, operates, manages, directs, and controls the San Joaquin County Sheriff's Office ("SJCSO"), and is the employer of the individual COUNTY Defendants, as well as certain DOE Defendants. Under the COUNTY's authority, the SJCSO operates the San Joaquin County jail (hereafter referred to as the "Jail" or "jail"). Defendant COUNTY also owns, operates, manages, directs, and controls Correctional Health Services, also referred to as CHC ("CHC"), a division of the COUNTY. CHC is supposed to provide comprehensive medical, dental, chemical dependency, and mental health services, including critical medical care for inmates suffering from opioid withdrawal, to the adult inmate population at the COUNTY's main jail.

13. The true names and capacities of Defendants sued herein as DOES 1–25 ("DOE Defendants") are unknown to Plaintiffs, who, therefore, sue said Defendants by such fictitious names. Plaintiffs will seek leave to amend this Complaint to show their true names and capacities, when the same are ascertained. DOES 1–25 are comprised of SJCSO employees, including Correctional Officers, CHC employees, and any other, to-be-identified individuals employed by either the COUNTY or any other entity – private or public, as well as any other to-be-identified entities.

14. The acts and omissions of all COUNTY employees, who are named as Defendants in *Henne, et al. v. County of San Joaquin, et al.* (E.D. Cal. Case No. 2:24-cv-02275-TLN-AC), as set forth in the operative complaint therein, were at all material times pursuant to the actual customs, policies, practices, and procedures of the COUNTY and/or the SJSO and/or the CHC.

15. At all material times, each COUNTY employee acted under color of the laws, statutes, ordinances, and regulations of the State of California.

16. This action is timely filed within all applicable statutes of limitation.

17. This Complaint may be pleaded in the alternative, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

//

//

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                5

## **GENERAL ALLEGATIONS**

**I.    THE COUNTY'S EMPLOYEES, IN A DELIBERATELY INDIFFERENT FASHION, FAILED TO PROVIDE NEEDED MEDICAL CARE TO THE DECEDENT BY FAILING TO APPROPRIATELY MANAGE THE DECEDENT'S ACUTE WITHDRAWAL SYMPTOMS.**

18. Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

19. On August 10, 2023, at approximately 9:27 p.m., Decedent WILLIAM HENNE was booked into the COUNTY's Jail.

20. The Decedent reported being homeless. The Decedent further reported that he suffered from asthma and chronic obstructive pulmonary disease ("COPD"), which he managed with albuterol. The Decedent reported taking albuterol for his asthma and COPD five (5) times per day. The Decedent was ordered to be administered albuterol. The COUNTY's Medication Administration Record shows that HENNE never received any medication or treatment for his asthma and COPD, however.

21. On August 11, 2023, HENNE requested medical attention for withdrawal symptoms he was experiencing. He spoke to Defendant[2] CHC RN JANICE DANIELSON over the telephone; he was not seen in person. He reported, at approximately 6:25 p.m., that he was "Kicking Fentanyl", and was complaining of various withdrawal symptoms, including diarrhea. Diarrhea is a withdrawal symptom that can place a withdrawing inmate at substantial risk of suffering serious harm because it can lead to dehydration and other fatal complications.

22. At this time, HENNE reported to Defendant DANIELSON that he abused fentanyl, and informed her that he had last used fentanyl in the morning on the day he was arrested, on August 10, 2023.

23. HENNE reported using approximately two (2) grams per day for roughly the last two years.

---

[2] Where reference is made to an individual employee herein as "Defendant", it should be interpreted as being synonymous with "County employee", and the reference to the individual as a named Defendant applies to *Henne, et al. v. County of San Joaquin, et al.* (E.D. Cal. Case No. 2:24-cv-02275-TLN-AC).

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    6

24. Some substances are known to cause predictable illness when use is suddenly stopped. Predictable illness caused by stopping use of a substance is clinically known as withdrawal. Chronic opioid use is a common reason for newly incarcerated individuals to develop a withdrawal syndrome.

25. Opioid Use Disorder ("OUD") is the clinical name for opioid addiction.

26. HENNE suffered from OUD at all material times. There is a dangerous relationship between OUD and asthma and COPD. Upon information and belief, patients like HENNE who also suffer from asthma and OUD require more careful and vigilant monitoring due to the increased risk of asthma mortality.

27. COUNTY employee DANIELSON had access to HENNE's medical chart, which noted that he should be administered albuterol every day. Although DANIELSON initiated treatment for opioid withdrawal, she failed to administer any treatment or medication for HENNE's asthma and COPD. Although HENNE required daily administration of albuterol and reported taking it five times per day, DANIELSON made no notation that HENNE had not received any albuterol; DANIELSON did not cause any medication to be administered to HENNE.

28. On August 11, 2023, at approximately 6:30 p.m., the Opiate Withdrawal Protocol began, and medications were administered to HENNE.

29. The Opiate Withdrawal Protocol, however, only called for 32 ounces of Gatorade per day, for three days, which is inadequate to address the severe risks of dehydration, and which is, on information and belief, inadequate to address the hydration needs of a patient suffering from opioid withdrawal.

30. COWS stands for "Clinical Opiate Withdrawal Scale," and consists of a flowsheet for measuring symptoms for opiate withdrawal over a period of time. The COWS (Clinical Opiate Withdrawal Scale) Score was developed to assist clinicians in quantifying the degree of opiate withdrawal during their patient assessments.

31. On August 12, 2023, at approximately 9:24 a.m., HENNE was seen in the clinic at COUNTY's Jail by another COUNTY employee, Defendant CHC RN RITA MANANQUIL

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                    7

("MANANQUIL") for a follow up "on COWS." MANANQUIL noted that HENNE's COWS score at that time was 10, which was the same as the previous day. RN Mananquil noted that HENNE would "be referred to provider for suboxone use eval[,]" but there appears to be no record of this evaluation ever occurring.

32. Suboxone is a medicine to treat dependence on opioid drugs, including fentanyl.

33. On August 12, 2023, HENNE was continuing to suffer severe withdrawal symptoms and, consequently, he requested medical attention. On information and belief, he was again only assessed via a telephone call; he was not seen in the COUNTY's Jail clinic. The call took place at approximately 2:58 p.m., and HENNE spoke to Defendant MANANQUIL. HENNE complained at that time of nausea and vomiting, as well as body cramping. HENNE reported "withdrawing hard from fentanyl[,]" and reported **multiple episodes of** nausea and **vomiting**.

34. Vomiting is another withdrawal symptom that can place a withdrawing inmate at substantial risk of suffering serious harm because it can foreseeably lead to fatal dehydration, which either directly causes death or precipitates other fatal complications.

35. Vomiting can also be dangerous for those who suffer from untreated asthma and COPD due to the risk of aspiration and asthma-related complications. By August 12, 2023, HENNE had gone two days without treatment for his asthma and COPD. Defendant MANANQUIL failed to note that HENNE had not received albuterol for two days and made no attempt to ensure that albuterol was administered to HENNE, even though HENNE had reported in intake needing to take it five times per day.

36. When HENNE was assessed by MANANQUIL, on August 12, 2023, at approximately 2:58 p.m., he was also complaining of **severe abdominal cramping** and **generalized joint pain**.

37. At that time, HENNE's COWS score was up to 13. MANANQUIL transferred HENNE to "SOMED" – which, on information and belief, is the Jail's infirmary – for closer observation and for an evaluation by an M.D. It does not appear that HENNE ever received the evaluation by an M.D., however, before he died in-custody. Further, MANANQUIL otherwise took no steps to ensure HENNE received treatment for asthma and COPD.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                    8

38. On August 12, 2023, in the infirmary, Defendant CHC RN DARIN STRAUB ("STRAUB") noted that HENNE was restless, reported **multiple episodes of emesis** (vomiting) that morning, and reported body aches. Additionally, HENNE's lips were dry. These were signs of concerning dehydration. Yet, no physician was contacted and no IV was administered to HENNE to hydrate his body.

39. Additionally, the Opioid Withdrawal Protocol required HENNE to be weighed and assessed every 8 hours for determination of a COWS score. His vitals were also required to be taken every 8 hours. HENNE's previous COWS assessment and score occurred with MANANQUIL in the afternoon, at approximately 2:58 p.m.

40. Upon information and belief, either STRAUB or Defendant CHC RN MINERVA EBARVIA ("EBARVIA") failed to conduct the COWS assessment that should have occurred at approximately at 11:00 p.m. on August 12, 2023. STRAUB and/or EBARVIA further failed to obtain HENNE's vital signs. And STRAUB and/or EBARVIA took no steps to administer albuterol to HENNE, nor to otherwise treat HENNE's asthma and COPD. Given HENNE's repeated and prolonged episodes of vomiting, the failure to adequately treat his asthma and COPD placed him at higher risk of suffering asthma-related complications.

41. Critically, Defendants STRAUB and/or EBARVIA failed to measure HENNE's respiration and oxygen saturation and failed to record HENNE's peak flow rate to determine whether he was suffering any consequences from his untreated asthma and COPD.

42. On August 13, 2024, Defendant CHC RN ALYSSA AGRIPPINO ("AGRIPPINO") purportedly had an interaction with HENNE, at 3:17 a.m. Although AGRIPPINO calculated a COWS score for HENNE, she did not take HENNE's vitals. AGRIPPINO, therefore, failed to obtain HENNE's oxygen saturation, failed to measure his respiration, and failed to record his blood pressure and weight. Defendant AGRIPPINO failed to record HENNE's peak flow rate to determine whether he was suffering any consequences from his untreated asthma and COPD. Further, AGRIPPINO took no steps to administer HENNE any albuterol or any other medication or treatment for his asthma and COPD.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    9

43. On August 13, 2023, HENNE's vital signs were taken, at approximately 8:45 or 9:20 a.m., by either Defendant EBARVIA and/or Defendant CHC RN CYNTHIA BISCOCHO. Under the circumstances, and in view of HENNE's acute withdrawals, these vital signs – blood pressure of 94/66 and a heart rate of 110 – were outside of the normal range and, coupled with the fact that HENNE reported that he was **unable to void** (urinate), indicated HENNE was suffering from severe dehydration. Defendants EBARVIA and/or BISCOCHO, in view of these indications, were required to contact a physician to assess HENNE, place HENNE on an IV, and/or cause HENNE to be transferred to the emergency room at San Joaquin General Hospital (or another hospital capable of properly treating HENNE).

44. When Defendants EBARVIA and/or BISCOCHO saw HENNE, on August 13, 2023, at approximately 8:45 or 9:20 a.m., HENNE had become cardiovascularly unstable – he had a high heart rate and low blood pressure. HENNE's inability to void signaled his bladder was empty – indicating dehydration – and indicating that he was not making urine because his blood volume was very low. The dehydration from which HENNE was suffering put him at substantial risk of suffering serious harm.

45. Yet, Defendants EBARVIA and/or BISCOCHO failed to call an M.D., failed to consult with an M.D., failed to administer a saline solution to HENNE via an IV, failed to intensely monitor HENNE, and failed to hospitalize HENNE.

**II.    WITH DELIBERATE INDIFFERENCE TO HIS SERIOUS MEDICAL NEEDS, THE COUNTY'S CHC EMPLOYEES ALL FAILED TO PROPERLY NOTIFY A MEDICAL PRACTITIONER AND, CONSEQUENTLY, HENNE WAS NEVER PROPERLY ASSESSED AND HIS CARE WAS NOT PROPERLY TRANSFERRED TO AN INPATIENT PROVIDER, THUS RESULTING IN HIS PREVENTABLE DEATH.**

46. On August 13, 2023, when Defendants EBARVIA and/or BISCOCHO saw HENNE in the infirmary in the morning, he also reported cramping. Nonetheless, despite his severe and acute dehydration, and despite his reported cramping, Defendants EBARVIA and/or BISCOCHO did not contact a physician to assess HENNE, did not place HENNE on an IV, and did not cause HENNE to be transferred to the emergency room at San Joaquin General Hospital, at least one of

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                          10

which was required and which a reasonably careful RN would have done in the same or similar circumstances.

47. Despite HENNE displaying vital signs that indicated he was cardiovascularly unstable and indicating his blood volume was low, coupled with an inability to void, Defendants EBARVIA and/or BISCOCHO made an intentional decision to fail to consult with and summon an M.D. to assess HENNE, made an intentional decision to fail to cause HENNE to be hospitalized, and made an intentional decision to fail to administer an IV to HENNE.

48. In doing so, Defendants EBARVIA and/or BISCOCHO both failed to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful RNs would have used in the same or similar circumstances – which, inter alia, required immediately summoning a doctor and escalating HENNE's care, as well as placing HENNE on an IV, or transferring HENNE to the emergency room at San Joaquin General Hospital – but also, by failing to do so, Defendants EBARVIA and/or BISCOCHO put HENNE at substantial risk of suffering serious harm – to wit, fatal dehydration, inter alia.

49. Furthermore, Defendants EBARVIA and/or BISCOCHO did not take reasonable available measures to abate or reduce the risk of serious harm to HENNE, including, but not limited to, ordering that HENNE be transferred or requesting approval for HENNE to be transferred to the emergency room at San Joaquin County General Hospital, summoning an M.D. to immediately assess and treat HENNE, and/or ordering that HENNE be put on an IV – even though a reasonable RN under the circumstances would have understood the high degree of risk involved to HENNE of failing to do any of these—making the consequences of Defendants EBARVIA's and/or BISCOCHO's conduct obvious.

50. HENNE's untreated dehydration progressively worsened.

51. Human cells are mostly made up of water. Whether by excess loss of water through sweating, vomiting, diarrhea, bleeding, or by reduced fluid intake, a deficit of body water is clinically referred to as dehydration. Severe dehydration requires intravenous fluid administration. Severe dehydration, if not treated, will result in death.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    11

52. The acute medical condition precipitated by opiate withdrawal is a frequent and recurring one in county jails. Serious deterioration of a patient suffering from withdrawals can happen in a jail like the COUNTY's, and it is a foreseeable outcome. When circumstances occur like those that existed with regard to HENNE, prompt notification of a healthcare practitioner, such as a physician, physician's assistant, or advanced practice registered nurse is required, so that the patient's condition can be assessed, and an appropriate treatment plan can be immediately put in place and executed, to address the patient's acute dehydration. As a result of the deliberate indifference of the COUNTY's employees, EBARVIA and/or BISCOCHO, who were acting pursuant to the COUNTY's customs, policies, practices, protocols, and/or procedures, the proper notification to a physician was not made, the proper assessment never occurred, and no appropriate treatment plan was put into place; HENNE required either that an IV immediately be administered, or that he be hospitalized and given an IV, so his severe dehydration could be treated with intravenous fluids (IV), and so that he would be closely and appropriately monitored.

53. Later that day, on August 13, 2023, Defendant BISCOCHO saw HENNE on the bed in the infirmary, at approximately 3:30 p.m.– 4:00 p.m., in a prone position, which was cause for concern; HENNE purportedly refused to get up and declined to get his meds. HENNE was inferably weak because he was suffering from acute dehydration, inter alia. At that time, HENNE still had not been provided with an IV, despite his acute dehydration, with deliberate indifference to his serious medical needs.

54. Notably, the Opiate Withdrawal Protocol for HENNE states: "with refusal of care in a person with definite withdrawal symptoms, move to a higher level of care." Pursuant to the COUNTY's customs, policies, practices and/or procedures, or the failure by the COUNTY to enforce or properly execute its existing policies, practices, procedures, or protocols, this was not done with regard to HENNE because Defendant BISCOCHO did not summon a physician and did not cause HENNE to be hospitalized.

55. Importantly, it appears that, on August 13, 2023, no welfare check or adequate assessment of HENNE's well-being took place by any COUNTY employee – either from the SJCSO, such as

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    12

a to-be-identified DOE Defendant Correctional Officer, Sheriff's Deputy, or other employee, or a to-be-identified DOE Defendant CHC employee, such as any medical professional – between either 3:30 p.m. or 4:00 p.m. and 5:02 p.m., when he was found lying on the floor, face-down, and unresponsive.

56. Thus, on August 13, 2023, after a substantial period of time had elapsed with no welfare check being performed on HENNE, despite his acute dehydration and other medical conditions, at approximately 5:02 p.m., Defendant BISCOCHO returned to HENNE's room, and found HENNE on the floor, unresponsive, and face-down.

57. HENNE was "pulled out of his room", CPR / chest compressions were started, and other lifesaving measures were attempted.

58. The life saving measures that were attempted, however, were unsuccessful. American Medical Response ("AMR") Paramedics responded to the COUNTY's jail and continued to attempt to resuscitate HENNE, but these efforts were unsuccessful, and AMR personnel pronounced HENNE dead, at approximately 5:22 p.m. AMR personnel noted HENNE had rigor mortis in his jaw and neck. Rigor mortis typically begins to appear within 2-3 hours of death, meaning HENNE had inferably been dead in his cell for approximately two hours before any Jail personnel checked on him.

59. When a withdrawing person like HENNE is dehydrated to the point where their cardiovascular system does not have the blood volume it is accustomed to having, then, since the heart is a pump, when there is not enough blood coming to the heart to get pumped out, an individual like HENNE's cardiac output gets decreased. When a person's cardiac output is decreased, their heart has to perfuse itself. This can cause the heart to stop functioning effectively. And once the heart does not pump effectively anymore, then a person has no blood pressure and goes into cardiac arrest. HENNE's fatal dehydration was a combination of not having enough blood volume and having abnormal potassium and sodium levels as a result of his vomiting, diarrhea, and acute dehydration. Additionally, on information and belief, HENNE's mismanaged acute withdrawal, coupled with his untreated asthma, potentially caused asthma-related

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    13

complications that were a factor in HENNE's death.

60. Therefore, by not taking the reasonable available measures – including, but not limited to, ordering that HENNE be transferred or requesting approval for HENNE to be transferred to the emergency room at San Joaquin County General Hospital, summoning an M.D. to immediately assess and treat HENNE, and ordering that HENNE be put on an IV – all of which occurred because the COUNTY's employees were acting pursuant to the customs, policies, practices and/or procedures of the COUNTY, the COUNTY's customs, policies, practices and/or procedures caused HENNE's death.

**III.  THE SAN JOAQUIN COUNTY JAIL HAS A DISTURBINGLY HIGH RATE OF IN-CUSTODY DEATHS AND COUNTY POLICYMAKERS WERE ON NOTICE PRIOR TO DECEDENT'S DEATH THAT UNCONSTITUTIONAL CONDITIONS EXISTED IN THE SAN JOAQUIN COUNTY JAIL, INCLUDING INADEQUATE TREATMENT AND MONITORING OF INMATES AT RISK OF SUFFERING SERIOUS HARM DUE TO OPIATE WITHDRAWAL.**

61. When the COUNTY OF SAN JOAQUIN takes custody of a person, the officials in charge of the custody and medical services at the San Joaquin County Jail have a responsibility to ensure the person's health and safety.

62. Yet, according to records produced by the California Department of Justice, between October 1, 2013, and October 1, 2023, 36 people died in the COUNTY's jail.

63. On information and belief, based on historical data, the average jail population for the COUNTY's jail is 1,300 inmates; as such, the annual mortality rate in the COUNTY OF SAN JOAQUIN's jail is 277 deaths per 100,000 inmates annually.

64. Whereas, according to the Bureau of Justice Statistics, the average jail mortality rate (calculated for 2019) is 167 deaths per 100,000 inmates annually.[3]

65. Thus, the COUNTY OF SAN JOAQUIN Jail's estimated mortality rate of 277 per 100,000

---

[3] E. Ann Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," Bureau of Justice Statistics Statistical Tables, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, retrieved August 13, 2025, from https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf, at p. 1; also accessible at: https://bjs.ojp.gov/library/publications/mortality-local-jails-2000-2019-statistical-tables.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                              14

inmates annually is significantly higher than the national average of 167 per 100,000, indicating that the COUNTY's in-custody death rate is disproportionately high per capita.

66. Of the 36 in-custody deaths in the COUNTY's Jail between October 1, 2013, and October 1, 2023, seven, including HENNE's, were categorized as being the result of "Drug Overdose"; with respect to the death of HENNE and likely others, this is actually a misnomer, however, and is a misinterpretation of the forensic data. On information and belief, either way, the cause of such deaths was related to a drug use disorder. Moreover, an individual may begin suffering withdrawal while intoxicated and many people who die from untreated drug withdrawal still have measurable amounts of drugs that appear in postmortem toxicology testing because the half-life of drugs varies widely from person to person.

67. Drug and alcohol intoxication and withdrawal are frequent and recurring medical conditions among detainees at jails and are conditions that the COUNTY OF SAN JOAQUIN Jail staff routinely encounters.

    a. "At the time of arrest and detention, it has been estimated that 70 to 80 percent of all inmates in local jails and State and Federal prisons had regular drug use or had committed a drug offense, and 34 to 52 percent of these inmates were intoxicated at the time of their arresting offense."[4]

    b. "Drug or alcohol intoxication has accounted for an increasing share of deaths in local jails over time. It accounted for 15% of all deaths in 2019, after suicide and heart disease (25%). The rate of intoxication deaths more than quadrupled, from 6 per 100,000 in 2000 to 26 per 100,000 in 2019."[5]

---

[4] Center for Substance Abuse Treatment, 2006, Detoxification and Substance Abuse Treatment, Treatment Improvement Protocol (TIP) Series, No. 45, HHS Publication No. (SMA) 15-4131, Rockville, MD: Substance Abuse and Mental Health Services Administration, retrieved November 1, 2023 from https://store.samhsa.gov/sites/default/files/d7/priv/sma15- 4131.pdf ("TIP 45"), at p. 118.

[5] E. Ann Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," Bureau of Justice Statistics Statistical Tables, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, retrieved December 17, 2021 from https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf, at p. 3.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                        15

68. "Sixty-three percent of individuals sentenced to jail (compared to 5 percent of adults in the general population) meet the diagnostic criterial for SUD (substance use disorder)."[6] Although suicide is technically the leading single cause of death in jails, "individuals with opioid use disorder have a threefold higher risk for suicidal behavior than those without opioid use disorder."[7]

69. Because many individuals arrive at the jail acutely intoxicated, treatment of acute intoxication and medically supervised withdrawal must occur in tandem. The standards of the National Commission on Correctional Health Care ("NCCHC"), a national accrediting agency for correctional health care that sets the generally accepted standards for correctional medicine, state that detainees showing signs of either acute intoxication or withdrawal must be regularly monitored by qualified health care professionals and **medically supervised withdrawal must be managed by a physician**. The NCCHC further requires that inmates "experiencing severe or progressive intoxication (overdose)" or severe alcohol or drug withdrawal be transferred immediately to a licensed acute care facility.

70. Moreover, prior to the in-custody death of HENNE, the COUNTY OF SAN JOAQUIN was well-aware of the widespread abuse of fentanyl in the community. Data from the California Department of Public Health ("CDPH") Opioid Surveillance Dashboard showed that San Joaquin County experienced a thirty-fold increase in the rate of fentanyl-related overdose deaths in a little over two years (0.37 per 100,000 residents in 2019 vs.13.13 per 100,000 in 2021). And according to a statement issued by San Joaquin County District Attorney Ron Freitas, the fentanyl overdose death rate in 2021 in San Joaquin County was 20 times higher than in 2018.

A. **The County of San Joaquin has a custom and practice of inadequate medical care for inmates suffering from acute intoxication and/or withdrawal**.

71. As evidenced by the following instances of San Joaquin County jail deaths, the Defendant

---

[6] *Guidelines for Managing Substance Withdrawal in Jails*, United States Department of Justice Bureau of Justice Assistance, June 2023, at p. 2, available at: https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance _Withdrawal_in_Jails.pdf
[7] *Id*.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                    16

COUNTY OF SAN JOAQUIN has a custom and practice of denying adequate medical care to detainees who are acutely intoxicated and/or withdrawing from drugs or alcohol, and failing to transfer these seriously ill individuals to acute care hospitals, ultimately resulting in the following deaths:

a. On March 7, 2014, Renaldo Rivera died at the San Joaquin County Jail of untreated acute intoxication and/or withdrawal.

b. On February 11, 2015, Alexander Sutherland died at the San Joaquin County Jail of untreated acute intoxication and/or withdrawal.

c. On August 19, 2015, Stephanie Allen died at the San Joaquin County Jail due to untreated acute intoxication and/or withdrawal.

d. On October 30, 2022, Moises Barrios died at the San Joaquin County Jail of untreated acute intoxication and/or withdrawal.

e. On May 15, 2023, Huquinton Stevenson died at the San Joaquin County Jail of untreated acute intoxication and/or withdrawal.

f. On August 13, 2023, William Henne died at the San Joaquin County Jail of untreated withdrawal.

g. On August 4, 2024, Tommy Torres died at the San Joaquin County Jail due to untreated intoxication and/or withdrawal.

72. Defendant COUNTY was well-aware of deficiencies in medical care that its medical staff failed to provide to detainees, leading to the deaths described in the foregoing paragraph and subparagraphs, and also, on information and belief, leading to a to-be-determined substantial number of other inmates suffering harm from untreated withdrawal, even if such inmates did not ultimately perish. After an in-custody death, Title 15, section 1046 of the California Code of Regulations requires the COUNTY to conduct a review of the inmate death to "determine the appropriateness of clinical care; whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study."

73. Similarly, COUNTY policy no. 109 requires a comprehensive review of the in-custody

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                                    17

death of any incarcerated person. "The purpose of this review is to alert the medical delivery/custody systems to any areas of concern which may have led to the death or failed to prevent it. Areas where integration of custody and medical policies need improvement may be identified." The roles of both Correctional Health Services staff and Sheriff's Office Custody staff are to be evaluated with respect to the inmate's death.

74. Thus, Defendant COUNTY knew or should have known, and in any event, had reason to know, of systemic deficiencies in the lack of care provided to inmates suffering from intoxication and/or withdrawal, ultimately resulting in in-custody deaths.

**B. The County of San Joaquin has a custom and practice of conducting inadequate mortality reviews.**

75. As demonstrated by the preventable deaths of individuals identified in ¶ 71, *supra*, and given the fact that 36 people died at the San Joaquin County jail in a 10-year period, the COUNTY failed to conduct constitutionally adequate reviews of in-custody deaths. Inmates at the San Joaquin County jail were dying of untreated acute intoxication and/or withdrawal; yet, despite the COUNTY's awareness of these deaths, the death reviews failed to identify areas where policies and training could be improved. Effective reviews of in-custody deaths require a system of: (1) identification of deficiencies; (2) identification of potential solutions to remedy those deficiencies; and (3) tracking implementation of those potential solutions to measure the efficacy of the method at reducing mortality and morbidity at the Jail. Upon information and belief, the COUNTY conducted death reviews that were brief and cursory. These in-custody death reviews typically consisted of a single page that failed to identify systemic issues and failed to identify and track potential solutions to systemic problems.

**C. The County of San Joaquin has a custom and practice of inadequately training its employees and maintains constitutionally infirm policies.**

76. On information and belief, by custom and policy, neither Defendant COUNTY's medical staff, nor Defendant COUNTY's custodial staff, are adequately trained to recognize signs and symptoms of acute intoxication or withdrawal.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                         18

77. Defendant COUNTY has failed to ensure that the care of inmates, such as the Decedent in this case, is transferred to a higher-level provider, such as a medical doctor and, where necessary, to an inpatient hospital, in a timely manner. COUNTY staff are not trained as to when an inmate's symptom severity necessitates referral to a higher-level provider and, where necessary, to an inpatient hospital.

78. In fact, Defendant COUNTY maintains a constitutionally deficient policy regarding transfer to a hospital for inmates who are acutely intoxicated or suffering from severe symptoms of withdrawal. COUNTY personnel fail to make appropriate referrals to higher-level providers and fail to timely transfer inmates to an inpatient facility; consequently, inmates who exhibit symptoms of acute drug or alcohol withdrawal are not timely treated. Defendant COUNTY's policymakers and officials knew it maintained a constitutionally inadequate policy for hospital transfers.

79. Defendant COUNTY fails to identify, treat, track, and supervise inmates who are at substantial risk of suffering serious harm due to acute opiate withdrawal.

80. As evidenced in the deaths of inmates described in ¶ 71, *supra*, Defendant COUNTY has a custom of not adequately training its custodial staff to identify inmates who are at risk of serious complications from intoxication or withdrawal and to respond appropriately to inmates who are exhibiting signs of experiencing medical problems, putting them at substantial risk of suffering serious harm. This is especially problematic because San Joaquin County Sheriff's Office staff, both during the intake process and for the duration of an inmate's time at the San Joaquin County Jail, are primarily responsible for alerting medical staff when an inmate requires immediate medical attention. DOJ guidelines state that custody staff must be able to identify emerging signs and symptoms of withdrawal in individuals who initially screen negative, particularly in the first 72 hours after intake, because some individuals may not be forthright about intoxication and their risk of withdrawal. Because custody have not been properly trained, the individuals described in ¶ 71, as well as HENNE, needlessly died in custody due to intoxication and withdrawal.

81. Defendant COUNTY's policy for conducting welfare checks is also inadequate to ensure

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                    19

the safety and continuing wellbeing of inmates that are suffering from opiate withdrawals. Defendant COUNTY's custodial staff frequently fail to conduct appropriate and sufficiently thorough checks at intermittent and unpredictable times. Defendant COUNTY's policy concerning the performance of "safety checks" is perfunctory and does not include direct visual observation that is sufficient to assess the inmate's well-being – or lack thereof – and behavior. Defendant COUNTY's policy of "safety checks" fails to use verbal interaction as a part of the "safety checks", even when visual observation of the inmate is obscured, or circumstances otherwise demonstrate a reason for concern about the inmate's well-being and behavior. As a result, inmates, including inmates suffering from acute opiate withdrawals, are put at a substantial risk of suffering serious harm. And the COUNTY's constitutionally infirm welfare checks are evidenced by the fact that, in this case, HENNE was already in rigor mortis when seen by AMR personnel; as noted in ¶ 58, *supra*, when they assessed him, AMR personnel noted HENNE had rigor mortis in his jaw and neck. Rigor mortis typically begins to appear within 2-3 hours of death, meaning HENNE had inferably been dead in his cell for approximately two hours before any Jail personnel checked on him. This means that either no welfare checks – or constitutionally deficient welfare checks – had been conducted on HENNE in the preceding interval of time.

82. Defendant COUNTY, at the time of HENNE's incarceration and in-custody death had – and at present, has – knowledge of the substantial risk of harm caused by inadequate opiate withdrawal treatment policies and practices in the San Joaquin County Jail, but has failed to take steps to prevent, or even to diminish, the harmful effects of these unlawful policies and practices. Defendant COUNTY is, thus, deliberately indifferent to the risk of harm to inmates created by the COUNTY's failure to operate a constitutionally adequate opiate withdrawal treatment program in its jail.

83. Furthermore, if COUNTY is unable to provide constitutionally adequate opiate withdrawal treatment in its jail, it must enact and execute policies that dictate that inmates, such as the Decedent in this case, be transferred out of the San Joaquin County Jail to an inpatient facility, where they will be appropriately treated and monitored. Yet, the COUNTY failed to do so.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    20

84. Defendants COUNTY, to-be-identified supervisors and policymakers for the COUNTY, and DOES 1–25 knew before HENNE's death that many preventable, in-custody deaths from constitutionally deficient opiate withdrawal management had occurred prior to that date, which were caused by the COUNTY's customs and practices of: not providing sufficient opiate withdrawal treatment; not providing a constitutionally adequate opiate withdrawal treatment program; failing to require that R.N.'s consult with and refer patients to be seen by a physician or mid-level provider for deteriorating and serious medical conditions that require immediate transfer to a hospital for inpatient treatment and supervision; improperly addressing the opiate-detoxification needs of inmates; failing to ensure adequate staffing levels by failing to ensure an adequate number of nurses and physicians would be on duty to ensure seriously ill inmates suffering from acute withdrawal were monitored and treated; and failing to properly monitor inmates, especially those at risk of suffering serious harm as a result of opiate-withdrawal related complications.

85. Additionally, the COUNTY failed to have an appropriate policy that would have required its jail staff – including both medical and non-medical personnel – to be familiar with the medical history and medical needs of inmates, as evidenced in the instant case, and as evidenced in *M.P., et al. v. County of San Joaquin, et al.* (E.D. Cal. Case No. 2:23-cv-00245-KJM-AC) and *Shaheed v. County of San Joaquin, et al*. (E.D. Cal. Case No. 2:21-cv-01109-JAM-DB), among other cases.

## IV.     THE COUNTY MAINTAINED A POLICY OF INACTION: THE COUNTY FAILED TO PROMULGATE CONSTITUTIONALLY ADEQUATE POLICIES FOR TREATMENT AND MANAGEMENT OF ACUTE WITHDRAWAL.

86. Defendant COUNTY's policies and practices for screening, supervising, and treating detainees at substantial risk of suffering serious harm due to acute opiate withdrawal are inadequate. Individuals suffering from opioid use disorder (OUD), like HENNE, must be provided buprenorphine or methadone to prevent withdrawal and treat the disorder. Without pharmaceutical intervention, individuals suffering from OUD who are in acute withdrawal are at risk of death. The United States Department of Justice guidance, *Guidelines for Managing Substance Withdrawals in Jails*, published in June 2023, states that "[e]ffective management of opioid

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    21

withdrawal involves initiation of long-term buprenorphine or methadone. When administered in a timely manner, these medications prevent withdrawal *and* treat OUD (opioid use disorder)." (Emphasis in original.) The DOJ guidelines further state that when buprenorphine and methadone treatment "are not immediately available in the jail, timely transfer to a higher level of care is indicated." When a provider (i.e., a physician) is not available, "the patient should be immediately transferred to a hospital."

87. Because medication can only be prescribed by a physician, and dosing of buprenorphine or methadone must be individualized and adjusted based on individual factors and response, a physician must oversee the care and treatment of individuals suffering from withdrawal.

88. The COUNTY's policy for treating opiate withdrawal is deficient because it tasks nurses with managing and overseeing the care of inmate-patients who are suffering acute withdrawal.

89. Furthermore, because the COUNTY's policy relies on nurses, its policy is deficient because it does not require that inmates suffering from withdrawal are treated with medication (e.g. buprenorphine or methadone) to prevent needless suffering and death. Relatedly, the COUNTY's policy by its own terms precludes the taking of reasonable available measures to abate or reduce the risk of serious harm – i.e., the treatment of withdrawal with medication – to detainees, since the policy relies on nurses to treat detainees suffering from withdrawal, and nurses cannot prescribe the necessary medication, nor can nurses oversee the treatment by assessing the detainee and adjusting the administration of medication to a detainee based on the detainee's individual factors and response.

90. Moreover, because there is significant individual variation in the timing and intensity of withdrawal, a physician/prescriber must order implementation of tailored and individualized withdrawal protocols for each patient with dosing and frequency of medication specified for the individual patient.

91. The COUNTY, however, subjects all inmates to a standard nursing procedure that treats all inmates suffering from withdrawal the same, regardless of symptom severity or presentation. The COUNTY does not require treatment by a physician and does not instruct nurses when a

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                    22

patient should be referred to a high-level of care. This cookie-cutter approach places detainees at substantial risk of suffering serious harm, fails to require individualized treatment plans that necessarily – if adequate – would require reasonable available measures to abate or reduce the risk of serious harm (such as the administration of necessary medication that would be overseen by a qualified physician), and, consequently, causes serious harm to detainees, including death.

92. Finally, the COUNTY does not adequately staff the Jail with physicians and high-level providers, such as nurse practitioners and physicians' assistants. On August 12, 2023, and August 13, 2023, there was no physician, nurse practitioner, or physician's assistant working at the Jail during the day shift or evening shift. There was no one who could prescribe HENNE medication or assess him as his condition dramatically deteriorated.

## V. HENNE'S DEATH WAS THE RESULT OF THE COUNTY DEFENDANTS' DELIBERATE INDIFFERENCE TO HIS SERIOUS MEDICAL NEEDS AND WELLBEING, AND THE FAILURE TO PROVIDE SAFE CONDITIONS OF CONFINEMENT.

93. HENNE's death was the proximate result of the COUNTY Defendants' deliberate indifference to his serious medical needs and wellbeing, as well as the failure to protect him by providing safe conditions of confinement, as set forth above.

94. HENNE's death was also the proximate result of Defendant COUNTY's failure to reasonably train and supervise the jail deputies tasked with screening, admitting, observing, monitoring, and protecting HENNE. These substantial failures reflect Defendant COUNTY's policies of implicitly or directly ratifying and/or authorizing the deliberate indifference to serious medical needs and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline correctional officers employed by Defendant COUNTY, with deliberate indifference to inmates' serious medical needs, and subjecting pretrial detainees like HENNE to conditions of confinement that put HENNE and others at substantial risk of suffering serious harm. These failures persisted, despite the availability of measures to abate or reduce the risk of putting HENNE and others at substantial risk of suffering serious harm, which measures are described in the paragraphs above.

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                23

95. HENNE's death was also the proximate result of the COUNTY Defendants' failure to reasonably staff, train, supervise, and equip its medical staff in the proper and reasonable screening, assessment, and care of inmates needing emergency medical treatment, emergency withdrawal treatment, and treatment for detoxification from drugs, including fentanyl and opiates.

96. At all material times, and alternatively, the actions and omissions of each COUNTY employee were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately indifferent to Decedent's and Plaintiffs' rights, done with actual malice, recklessness, gross negligence, deliberate indifference, negligence, and/or were otherwise objectively unreasonable.

97. As a direct and proximate result of each Defendants' acts and/or omissions, as set forth above, Plaintiffs sustained the following injuries and damages, past and future, including, but not limited to:

    a.    Hospital and medical expenses, pursuant to California Code of Civil Procedure § 377.20 *et seq*. (Survival Claims by Plaintiffs F.H., W.R.H., and W.A.H.);

    b.    Coroner's fees, funeral, and burial expenses, pursuant to California Code of Civil Procedure § 377.20 *et seq*. (Survival Claims by Plaintiffs F.H., W.R.H., and W.A.H.);

    c.    Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support (all Plaintiffs);

    d.    WILLIAM HENNE's loss of life, including loss of enjoyment of her life, pursuant to federal civil-rights law (Survival Claims by Plaintiffs F.H., W.R.H., and W.A.H.);

    e.    WILLIAM HENNE's pre-death, conscious pain and suffering, pursuant to California law (Cal. Code Civ. Proc. § 377.34) and federal civil-rights law (Survival Claims by Plaintiffs F.H., W.R.H., and W.A.H.);

    f.    All Plaintiffs' loss of their relationship with the WILLIAM HENNE, and WILLIAM HENNE's loss of his relationship with all Plaintiffs, pursuant to federal civil rights law (all Plaintiffs, based on *Monell* claims predicated on individual § 1983 claims); and,

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                   24

g.    All damages, penalties, costs, and attorneys' fees recoverable under 42 U.S.C. §§ 1983, 1988, and as otherwise allowed under United States statutes, codes, and common law.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983—*Monell* Liability)**
**PLAINTIFFS AGAINST DEFENDANT COUNTY OF SAN JOAQUIN and DOES 1–25**

98. Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

99. By the actions and omissions described above, the COUNTY's employees deprived WILLIAM HENNE, through Plaintiffs, of the following clearly established and well-settled constitutional rights that are protected by the First and Fourteenth Amendment to the United States Constitution:

a.    The right to be free from wrongful government interference with familial relationships, and Plaintiffs' right to companionship, society, and support;

b.    WILLIAM HENNE's right to needed medical care while in custody; and,

c.    WILLIAM HENNE's right to be protected and to safe conditions of confinement while in custody;

100.    COUNTY employees DANIELSON and MANANQUIL knew, or should have known (i.e., had reason to know), that HENNE had not received any medication or treatment for his asthma and COPD because they had access to his medical chart, which indicated that HENNE reported taking albuterol five (5) times per day for his asthma, and which ordered the daily administration of albuterol to treat his asthma. HENNE, however, never received this medication. Defendants DANIELSON and MANANQUIL knew or had reason to know that untreated asthma could severely exacerbate the risks and symptoms of opioid withdrawal. Yet, both these COUNTY employees, acting pursuant to the customs, policies, practices and/or procedures of the COUNTY, failed to take any measures to ensure HENNE received medication and care for his asthma and COPD.

101.    COUNTY employees EBARVIA and STRAUB failed to follow the mandatory

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                25

Opioid Withdrawal Protocol for WILLIAM HENNE. They knew HENNE had to be assessed every 8 hours, which included weighing him, taking his vital signs, and calculating a COWS score. COUNTY employees EBARVIA and STRAUB failed to ensure that these steps were taken within 8 hours. Periodic and routine assessments every 8 hours are necessary to monitor progressive worsening of symptoms and the decline of a patient's health, including indications of dehydration. By failing to capture this critical data, COUNTY employees EBARVIA and STRAUB ignored HENNE's worsening condition. They knew he had already complained of prolonged vomiting and diarrhea. They also knew, or should have known (i.e., had reason to know), that HENNE had not received any medication or treatment for his asthma and COPD. These COUNTY employees, thus, acting pursuant to the customs, policies, practices and/or procedures of the COUNTY, failed to abate the risk of serious harm to Decedent HENNE.

102.    Likewise, COUNTY employee AGRIPPINO failed to weigh Mr. HENNE or record his vital signs at the appropriate juncture in accordance with the Opioid Withdrawal Protocol. AGRIPPINO did not ask Mr. HENNE his subjective symptoms, or otherwise note if Mr. HENNE continued to suffer from vomiting and diarrhea. And AGRIPPINO failed to provide HENNE any treatment for his asthma and COPD. All of AGRIPPINO's failures were pursuant to the customs, policies, practices and/or procedures of the COUNTY.

103.    Despite his severe and acute dehydration, reported cramping, and dangerous vital signs, COUNTY employees EBARVIA and/or BISCOCHO did not contact a physician to assess HENNE, did not place HENNE on an IV, and did not cause HENNE to be transferred to the emergency room at San Joaquin General Hospital or otherwise hospitalize HENNE, all of which failures were pursuant to the customs, policies, practices and/or procedures of the COUNTY.

104.    The unconstitutional actions and/or omissions of the individual Defendants, as well as other employees or officers employed by or acting on behalf of the Defendant COUNTY, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendant COUNTY, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officials for Defendant COUNTY:

　　　　a.    To deny inmates access to timely, appropriate, competent, and necessary care for

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                26

serious medical needs, requiring such inmates in crisis to remain untreated in jail, instead of providing for their urgent, emergency medical needs;

b.       To allow and encourage inadequate and incompetent medical care for inmates;

c.       To fail to allocate sufficient funds for the provision of medical care for inmates, including financially disincentivizing staff from sending inmates with emergency medical needs to a hospital;

d.       To allow, encourage, and require unlicensed, incompetent, inadequately trained, and/or inadequately supervised staff to assess inmates' medical condition(s), needs, and treatment, including, but not limited to, staffing its jail with unqualified "gatekeepers" that have been unconstitutionally empowered and who are unqualified to do so, to decide whether or not to provide inmates with necessary care and hospitalization;

e.       To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning persons in a medical crisis, including detainees suffering from acute opiate withdrawal;

f.       To fail to have individual treatment plans for inmates with serious medical needs;

g.       To fail to ensure that its jail was staffed with an adequate number of nurses and physicians that would be on duty to ensure seriously ill inmates suffering from acute withdrawal were monitored and treated;

h.       To fail to have proper security checks on inmates, instead of security checks that are untimely and cursory;

i.       To cover up violations of constitutional rights by any or all of the following:

    i.       By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical care at the San Joaquin County Jail;

    ii.       By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct by COUNTY employees; and,

    iii.       By allowing, tolerating, and/or encouraging COUNTY staff to: fail to file

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    27

complete and accurate reports; file false reports; make false statements; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

j.      To allow, tolerate, and/or encourage a "code of silence" among law-enforcement officers, sheriff's office personnel, and COUNTY medical staff at the jail, whereby an officer, member of the sheriff's office, or other COUNTY employee does not provide adverse information against a fellow officer, member of the SJCSO, or COUNTY medical staff;

k.      To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (j) above, with deliberate indifference to the rights and safety of Decedent HENNE, of Plaintiffs, and of the public, and in the face of an obvious need for such policies, procedures, and training programs.

105.      Defendant COUNTY, through its employees and agents, and  through its policy-making supervisors, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants (identified and sued in *Henne, et al. v. County of San Joaquin, et al.* (E.D. Cal. Case No. 2:24-cv-02275-TLN-AC)) COUNTY OF SAN JOAQUIN CORRECTIONAL HEALTH CARE employees CHC RN JANICE DANIELSON, CHC RN RITA MANANQUIL, CHC RN MINERVA EBARVIA, CHC RN DARIN STRAUB, CHC RN ALYSSA AGRIPPINO, CHC RN CYNTHIA BISCOCHO, and DOES 1–25 (as identified and sued in Case No. 2:24-cv-02275-TLN-AC), and other COUNTY personnel, with deliberate indifference to Plaintiffs', WILLIAM HENNE's, and others' constitutional rights, which were thereby violated, as described above.

106.      The unconstitutional actions and/or omissions of DANIELSON, MANANQUIL, EBARVIA, STRAUB, AGRIPPINO, BISCOCHO, and DOES 1–25 (as identified and sued in Case No. 2:24-cv-02275-TLN-AC), as described above, were approved, tolerated, and/or ratified

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                28

by policymaking officials for the COUNTY. Plaintiffs are informed and believe, and thereon allege, that the details of this incident—and all the San Joaquin County Jail in-custody deaths preceding it—have been revealed to the authorized policymakers within the COUNTY, and that such policymakers have direct knowledge of the fact that the death of WILLIAM HENNE, as well as all of the other deaths at San Joaquin County Jail preceding this tragic death, were the result of deliberate indifference to his and others' serious medical needs. Notwithstanding this knowledge, the authorized policymakers within the COUNTY have approved of the conduct and decisions of DANIELSON, MANANQUIL, EBARVIA, STRAUB, AGRIPPINO, BISCOCHO, and DOES 1–25 (as identified and sued in Case No. 2:24-cv-02275-TLN-AC), and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, which resulted in the death of WILLIAM HENNE.  By so doing, the authorized policymakers within the COUNTY have shown affirmative agreement with the actions of DANIELSON, MANANQUIL, EBARVIA, STRAUB, AGRIPPINO, BISCOCHO, and DOES 1–25 (as identified and sued in Case No. 2:24-cv-02275-TLN-AC) and have ratified the unconstitutional acts of these COUNTY employees. Furthermore, Plaintiffs are informed and believe, and thereupon allege, that policy-making officials for the COUNTY were and are aware of a pattern of misconduct and injury caused by COUNTY employees that is similar to the conduct of Defendants described herein, but failed to discipline culpable employees, and failed to institute new procedures and policies within the COUNTY.

107.    The aforementioned customs, policies, practices, and procedures; the failures by the COUNTY to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; the failure of the COUNTY's employees to provide and administer the appropriate medication to HENNE, the failure to have HENNE's care be overseen by an appropriately qualified physician, and the failure to formulate and execute an individualized treatment plan for HENNE, all of which occurred because the COUNTY's employees were acting pursuant to the constitutionally infirm customs, policies, practices, and/or procedures of the COUNTY, including the failure by the COUNTY to have in place appropriate policies, practices, and/or procedures;

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                        29

and finally the unconstitutional orders, approvals, ratification, and/or toleration of wrongful conduct by Defendant COUNTY were all separately and cumulatively a moving force and/or a proximate cause of the deprivations of Plaintiffs' clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983.

108.    Additionally, the collective action or collective inaction of the COUNTY Defendants and other COUNTY personnel (whether named as Defendants or not) and/or the collective failures of COUNTY personnel proximately inflicted a systemic constitutional injury on Plaintiffs. *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *Owen v. City of Indep., Mo.*, 445 U.S. 622, 652, (1980).

109.    COUNTY's employees subjected WILLIAM HENNE to their wrongful conduct, depriving WILLIAM HENNE of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of WILLIAM HENNE and others would be violated by their acts and/or omissions.

110.    As a direct and proximate result of the unconstitutional actions, omissions, customs policies, practices, and procedures of Defendant COUNTY, as described above, WILLIAM HENNE suffered constitutional violations, pre-death pain and suffering, serious injuries, and death, and Plaintiffs suffered their own, personal First and Fourteenth Amendment violations and are entitled to damages, penalties, costs, and attorneys' fees against Defendant COUNTY, as set forth above, in ¶ 97.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

1. Compensatory damages in an amount according to proof and which is fair, just, and reasonable;

2. Attorneys' fees and costs of suit under 42 U.S.C. § 1988;

3. All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988, and as otherwise may be allowed by federal law; and,

4. For such other and further relief, according to proof, as this Court may deem appropriate,

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.                                    30

just, or proper.

Dated: August 13, 2025               **LAW OFFICE OF SANJAY S. SCHMIDT, GRACE JUN, ATTORNEY AT LAW, and LAW OFFICES OF PANOS LAGOS**

*/s/ Sanjay S. Schmidt*
By: SANJAY S. SCHMIDT
Attorneys for Plaintiffs

## JURY TRIAL DEMAND

Plaintiffs hereby respectfully demand a jury trial, pursuant to Federal Rule of Civil Procedure 38, for all claims and issues that are triable by a jury.

Dated: August 13, 2025               **LAW OFFICE OF SANJAY S. SCHMIDT, HELM LAW OFFICE, PC, and GRACE JUN, ATTORNEY AT LAW**

*/s/ Sanjay S. Schmidt*
By: SANJAY S. SCHMIDT
Attorneys for Plaintiffs

Complaint for Damages and Demand for Jury Trial
*Henne, et al. v. County of San Joaquin et al.*
Case No.           31